**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

June 6, 2008

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 07-20779
Summary Calendar

JOHNELLE STROUD

Plaintiff-Appellant

V.

BMC SOFTWARE INC

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-cv-01402

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Johnelle Stroud ("Stroud") appeals the district court's grant of summary judgment in favor of her former employer, Defendant-Appellee BMC Software, Inc. ("BMC"), on Stroud's retaliation claim under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"). Because we find no genuine issue of material fact on the merits of Stroud's retaliation claim, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. BACKGROUND

Stroud began working for BMC on January 14, 2002, as a financial analyst. Stroud originally reported to manager Steve Duson ("Duson"), who in turn reported to Financial Director Ricardo Rodriguez ("Rodriguez"). From early in her tenure, Stroud ran into trouble with excessive absenteeism. By March 7, 2002, Stroud had accumulated nine unexcused absences from work. Stroud's supervisor, Duson, met with Stroud and issued her a written warning detailing these absences.

In October 2002, BMC transferred Stroud laterally to another financial analyst position, where she reported directly to Rodriguez. In July 2003, on Rodriguez's recommendation, Stroud was awarded a stock option grant. In September 2003, Stroud was laterally transferred again and reported to Kim Dolan ("Dolan"), who was located in Waltham, Massachusetts. Because Stroud worked in Houston, Rodriguez supervised Stroud in Dolan's place whenever necessary. Around the time of her second transfer, BMC allowed Stroud to work under a flexible work schedule, in which she would work eighty hours in nine business days, then take the tenth day off.

But Stroud's absenteeism persisted. Dolan verbally warned Stroud that between January 1, 2003, and October 24, 2003, Stroud had accumulated eleven "unapproved" sick days, on top of the eight approved sick days she took. At that time, Dolan suspended Stroud's flexible work schedule and demanded that Stroud present a doctor's note for any additional sick days. On March 25, 2004, Stroud received a written warning from Dolan and Rodriguez noting that Stroud had incurred two unapproved sick days in the first three months of 2004. The written warning emphasized that further violations of the attendance policy could result in "disciplinary action up to and including termination."

In or around April 2004, Stroud informed Dolan that she was pregnant. Subsequently, Stroud missed several days of work, which Dolan attributed to her

pregnancy and did not categorize as sick days. In other words, Stroud was neither disciplined nor penalized for taking those days off. Around this time, Stroud began reporting to Don Caramanico ("Caramanico"), then Vice President of Outsourcing Sales for BMC. Between April and October 2004, Caramanico voiced his dissatisfaction with Stroud's job performance to Rodriguez and Dolan (though apparently not to Stroud). During this same period, Stroud received a performance report from Dolan (covering the year ending March 31, 2004) in which she scored an overall rating of three out of five, characterized as "meets expectations." Stroud disagreed with this evaluation and filed a formal "rebuttal," charging that the "meets expectations" rating was not accurate.

The record reflects other evidence of BMC's dissatisfaction with Stroud. In one episode recounted in differing versions by the parties, Stroud barely met a deadline on a quarterly accrued commissions report and reluctantly stayed late to finish the report after receiving a one-day extension. Although Stroud characterizes this event as a "non-issue" because she received no written reprimand, Rodriguez stated that this episode convinced him that "[i]n crunch time, [Stroud] wasn't dependable."

Stroud's subsequent supervisor, Caramanico, came to a similar conclusion, noting that Stroud was "not timely in her reporting."[1] Prior to Stroud's maternity leave, Caramanico communicated these concerns to Dolan and Rodriguez and requested that Stroud be transferred to another department.

---

[1] Caramanico elaborated in an affidavit:
Stroud supported my group until she left for maternity leave in October 2004. During the time she supported my group, I had serious concerns regarding her performance. Overall, Stroud was not performing to the needs of my group and was adding very little value to my team. She often did not attend scheduled meetings and was not connected to the sales employees in my group. She was not timely in her reporting and did not appear to understand our business, nor did she express an interest or make an effort to do so.

On October 28, 2004, Stroud began an approved FMLA leave in the lead up to her delivery date of December 22, 2004. She remained on FMLA leave through March 26, 2005, when she returned to work. In her absence, Stroud's department underwent significant organizational changes. Five new employees were hired, three employees (including Stroud) were assigned new roles, two employees transferred to other departments, and one employee resigned. Rodriguez reassigned Stroud to a "projects and reporting" position to replace an employee who transferred to another department. Meanwhile, BMC began a company-wide reduction in force. Rodriguez was asked to rank all of the employees working under him based on various criteria, such as skills or abilities, short-term impact, and long-term potential. Stroud ranked last. Thereafter, upper management informed Rodriguez that his department would be reduced by one employee and that two open positions would be frozen. Based upon the ranking he had prepared, Rodriguez selected Stroud for termination.

On March 26, 2005, Stroud returned to work from FMLA leave. On April 14, 2005—three weeks later—she was terminated along with 800 other BMC employees in a company-wide reduction in force. BMC offered Stroud its standard separation package.

In May 2005, Stroud filed a discrimination claim with the Equal Employment Opportunity Commission, alleging discrimination on the basis of disability, gender, and pregnancy. After an investigation, the EEOC determined that Stroud was not a victim of discrimination, and it issued a right-to-sue letter. On April 21, 2006, Stroud filed this suit. Specifically, Stroud alleged gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the Texas Commission on Human Rights Act, TEX. LAB. CODE ANN. § 21.001 et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); an FMLA retaliation claim; and a state-law claim of intentional infliction of emotional

distress. On June 29, 2007, BMC filed a motion for summary judgment, and the district court granted the motion with respect to Stroud's Title VII, ADA, FMLA, and intentional infliction of emotional distress claims. The court dismissed Stroud's claim under the Texas Commission on Human Rights Act. Stroud now appeals the district court's grant of summary judgment on her FMLA retaliation claim.[2]

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this appeal under 28 U.S.C. § 1291. We review a district court's order granting summary judgment de novo. Morris v. Equifax Info. Servs., LLC, 457 F.3d 460, 464 (5th Cir. 2006). Summary judgment is appropriate when, after considering the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Bulko v. Morgan Stanley DW, Inc., 450 F.3d 622, 624 (5th Cir. 2006). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a summary judgment motion, all facts and evidence must be taken in the light most favorable to the non-moving party. United Fire & Cas. Co. v. Hixson Bros., 453 F.3d 283, 285 (5th Cir. 2006).

## III. DISCUSSION

The FMLA was designed, in part, to allow eligible employees to take temporary leave for medical reasons or for the birth or adoption of a child. 29 U.S.C. § 2601(b)(2). Under the FMLA it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act. Id. § 2615(a)(1). In order to establish a prima

---

[2] Stroud apparently does not appeal the court's grant of summary judgment on her other claims.

facie case of FMLA retaliation, a plaintiff must establish that "(1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge."[3] Richardson v. Monitronics Int'l, Inc., 434 F.3d 327, 332 (5th Cir. 2005). If there is no direct evidence of discriminatory intent, we apply the burden shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Richardson, 434 F.3d at 332. Under this approach, once an employee has established a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. In cases involving a potential mixed motive for the adverse employment action, to survive summary judgment the employee must "offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or . . . (b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination." Id. at 333.

In this case there is no dispute that Stroud met the first two elements of a prima facie retaliation claim. However, the district court concluded that Stroud failed to show a causal link between her FMLA leave and her termination. The court reasoned that the temporal proximity between Stroud's return to work and her termination did not demonstrate a causal link, especially in light of the fact that over 800 other employees were terminated at the same time as Stroud under the reduction in force. As an alternative, the district court stated that even if Stroud could establish a prima facie retaliation claim, BMC had carried its burden under the McDonnell Douglas framework by establishing

---

[3] This third prong is sometimes elaborated: "(3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 768 (5th Cir. 2001).

a legitimate nonretaliatory reason for Stroud's termination—presumably Stroud's poor attendance record and poor performance and BMC's reduction in force—despite Stroud's "unsubstantiated allegations to the contrary."

On appeal, Stroud makes several arguments. Primarily, Stroud argues that the district court erred in finding that she failed to satisfy the causal link element of her prima facie retaliation claim. Stroud alleges that the district court (1) failed to credit her summary judgment evidence of an alleged pattern of discriminatory behavior by Rodriguez; and (2) incorrectly declined to infer a causal link from the temporal proximity between her FMLA leave and termination. In addition, Stroud contends that BMC's claim of a legitimate nondiscriminatory purpose—its reduction in force and Stroud's absenteeism and poor performance—is undermined by the fact that there were two positions open at the time of her termination and that Stroud's performance reviews reflect that she "meets expectations."

## A.    Stroud's Prima Facie Case

We first consider whether Stroud's summary judgment evidence is sufficient to establish a prima facie claim of retaliation. Stroud argues that the district court ignored her allegations that Rodriguez exhibited "a pattern of animosity towards women who took medical/maternity leave." Stroud cites a statement Rodriguez purportedly made that "he thought [Stroud] would not want to return [to work] after having the baby."[4] Stroud also claims that two

---

[4] Stroud recounted this conversation in an affidavit attached to her response to BMC's summary judgment motion:

> During one of my quarterly talks with Ricardo Rodriguez while I was pregnant, he asked me if I thought I would come back to work after having the baby. I told him that yes, I though [sic] I would want to work. He then talked about how his wife was a stay at home mom to their son and how he once had the opportunity to work from home when he worked for IBM and it was less than ideal for him because both he and his wife were at home all day. He then told me he thought I would not want to return after having the baby.

other BMC employees working under Rodriguez suffered adverse employment actions after taking maternity leave.

We find no evidence here to suggest a causal link between Stroud's FMLA leave and her termination. Rodriguez's statement that he did not expect Stroud to return to work after giving birth does not support an inference of retaliation. Rodriguez made that statement in the context of a larger discussion with Stroud about her future plans after giving birth. He asked about Stroud's plans and told her about his own past work experience. Even when viewing this evidence in a light most favorable to Stroud, it simply does not support her retaliation claim.

Similarly, Stroud's reference to the cases of two other pregnant BMC employees does not create a fact issue with respect to whether Stroud met her burden on the causal link element. Stroud relies on a deposition of Rodriguez in which he discussed the cases of those two women. One woman, who was demoted after her FMLA leave, had consistently underperformed in her job. According to Rodriguez's undisputed deposition, "she wasn't performing to her satisfaction nor to mine." Rodriguez held coaching sessions with the woman prior to her maternity leave, discussing how "her performance wasn't up to par"—an assessment with which the woman agreed. She was demoted after the next regularly scheduled annual evaluation.

A second woman who took maternity leave subsequently was terminated in a reduction in force, although in his deposition, Rodriguez was unsure whether she was terminated or demoted following her maternity leave. It is unclear why she was terminated; Rodriguez was not even asked that question. Nor does the deposition tell us whether her FMLA leave and termination occurred close in time.

This sparse evidence does not suggest any connection between either woman's FMLA leave and adverse employment action. Stroud offers no evidence

to counter Rodriguez's version of both cases, which in no way establishes that he has a bias against pregnant women.

With respect to Stroud's temporal proximity argument, it is a closer call as to whether the timing of her termination supports an inference of a causal link. The district court concluded that temporal proximity alone was insufficient to establish a causal link, in part because over 800 other employees were contemporaneously terminated as part of the reduction in force. However, that reasoning discards this court's prior holdings that temporal proximity alone can support an inference of a causal link.

The standard for establishing the causal link element in a retaliation claim is less stringent than a "but for" standard. Long v. Eastfield Coll., 88 F.3d 300, 305 n.4 (5th Cir. 1996). "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997) (emphasis omitted); see also Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993) (finding the causal link prong established where "[t]he only evidence available to support an inference of discrimination . . . is the temporal proximity" of the protected activity and the adverse employment action). The Supreme Court has noted that "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark County Sch. Dist. v. Breeden 532 U.S. 268, 273 (2001). Although the Court did not define "very close," it cited cases holding three and four-month periods insufficient to infer a causal link. Id. (citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three months), and Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four months)).

In noting lower courts' "very close" standard, the Supreme Court cited approvingly to a Tenth Circuit case, O'Neal v. Ferguson Construction Co., 237

F.3d 1248 (10th Cir. 2001). The Tenth Circuit has a somewhat more specific definition: "'[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation.'" Id. at 1253 (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)).

In Evans v. City of Houston, 246 F.3d 344, 355 (5th Cir. 2001) (issued prior to Breeden), this court found that a five-day lapse between an employee's protected activity and an adverse employment action was sufficient to satisfy the "causal link" prong of a prima facie retaliation claim, without any other evidence of a causal link. At the time of Evans, courts in this circuit had found temporal proximity of up to four months to be sufficient to show a causal link. See, e.g., Garrett v. Constar, Inc., No. Civ.A. 397-CV-2575, 1999 WL 354239, at *5 (N.D. Tex. May 25, 1999).[5]

More recently, we have further clarified the meaning of "very close." We have held that a five-month lapse, by itself, does not support an inference of a causal link. Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471-72 (5th Cir. 2002). In unpublished decisions, we have narrowed the range. For example, we concluded that two and a half months is a short enough period to support an inference of a causal link. Richard v. Cingular Wireless LLC, 233 F. App'x 334, 338 (5th Cir. 2007). Similarly, we found a fifteen-day lapse sufficiently close to support an inference of causation. Ware v. CLECO Power LLC, 90 F. App'x 705, 708 (5th Cir. 2004).

---

[5] We have noted that "the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case." Swanson, 110 F.3d at 1188 n.3. However, Stroud does not allege merely that her termination occurred after her FMLA leave. She notes that it occurred closely after her return to work from FMLA leave.

We have found no cases holding a three-week period, or shorter, to be insufficient to support an inference of a causal link. Therefore, following Evans, we believe the district court should have found that Stroud made a prima facie retaliation claim sufficient to shift the burden to BMC.

Therefore, we hold that the district court should have found Stroud's prima facie claim satisfied. Ultimately, however, this does not affect this case's outcome because, as discussed below, Stroud fails to refute BMC's legitimate, nondiscriminatory reasons for her termination.

B.     BMC's Non-Discriminatory Purpose

Because Stroud has made a prima facie showing on her retaliation claim, the burden shifts to BMC to articulate a "legitimate, nondiscriminatory reason" for Stroud's termination. Richardson, 434 F.3d at 332. BMC asserts that Stroud was terminated due to a company-wide reduction in force that involved the termination of 800 other employees. In preparation for the reduction in force, BMC instructed Rodriguez to rank employees based on skills, abilities, short-term impact, and long-term potential. According to Rodriguez, Stroud received the lowest ranking in his department, and Rodriguez therefore designated her as the employee to be terminated.

In addition to BMC's reduction in force, the record reflects that Stroud had a history of excessive absenteeism and had most recently been given only a fair evaluation. Although her technical score was "meets expectations," Stroud clearly did not consider this to be a positive evaluation: she challenged her review, filing a formal "rebuttal." Stroud incorrectly characterizes her past work performance and evaluations in an attempt to classify herself as a model employee. Prior to her FMLA leave, Stroud's managers had warned her, both in writing and verbally, that her absenteeism could lead to termination. The sum of this evidence presents substantial nondiscriminatory reasons for BMC to fire Stroud.

## C.    Pretext or Discriminatory Purpose

Because BMC has shown a legitimate, nondiscriminatory reason for Stroud's termination, the only way Stroud can survive summary judgment is if she shows either that (1) BMC's explanation was pretextual, or (2) BMC's nondiscriminatory rationale, "although true, is but one of the reasons for its conduct, another of which was discrimination." Richardson, 434 F.3d at 333.

Under either approach, Stroud's arguments come up short. First, she alleges that BMC's reference to her absences is pretext because the company misapplied its own policy on absences, which apparently stated no maximum number of allowed absences. Nevertheless, we can assume that BMC wants its employees to show up at work. Stroud's attendance record was dismal, and she was warned repeatedly about her excessive absenteeism. This rationale does not appear to be pretextual.

Next, Stroud notes that two financial analyst positions became vacant around the time of her termination, and both were filled by new hires. This Stroud argues, undermines BMC's argument that her termination resulted from the reduction in force. However, Rodriguez explained in his deposition that Stroud was not "qualified" for either of these positions because she lacked the education and experience requirements. In addition, Rodriguez remained bothered by her attendance problems and his belief that she was "not dependable." Thus, the mere existence of two open positions at the time of the reduction in force does not override BMC's legitimate reasons for terminating Stroud.

Stroud also alleges that the legitimate reduction in force gave BMC the ability to mask its retaliatory firing of her: "[A]ny company who wanted to fire individuals who engaged in protected activity . . . could just include that individual in it's [sic] reduction in force." While this may be true, it does not excuse Stroud from her burden to prove—or at this stage raise a fact issue

regarding—her claim of retaliation. Furthermore, the mere fact of BMC's reduction in force more strongly suggests there was no retaliatory purpose in this case, especially given Stroud's past poor job performance and absenteeism.

In an effort to show discriminatory purpose, Stroud repeats her allegations of Rodriguez's pattern of discrimination against pregnant women. Above, we concluded that Stroud's allegations of a discriminatory pattern by Rodriguez were insufficient to support Stroud's prima facie case. Similarly, we find that these allegations do not constitute circumstantial evidence of a discriminatory motive behind Stroud's termination.

That leaves only temporal proximity as circumstantial evidence of a discriminatory purpose. "'Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation. However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive.'" Woodson v. Scott & White Mem'l Hosp., 255 F. App'x 17, 20 (5th Cir. 2007) (quoting McCoy v. City of Shreveport, 492 F.3d 551, 562 (5th Cir. 2007)); see also Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802, 808 (5th Cir. 2007) (holding that temporal proximity alone is insufficient to support a finding of "but for" causation in a Title VII retaliation suit). Stroud has offered no such evidence. Accordingly, we affirm the district court's grant of summary judgment in favor of BMC.

AFFIRMED.